*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2011-107

JULY TERM, 2011

| | |
|---|---|
| In re D.L.S., Juvenile | }    APPEALED FROM: |
| | } |
| | } |
| | }    Superior Court, Chittenden Unit, |
| | }    Family Division |
| | } |
| | }    DOCKET NO. F445-11-08 Cnjv |

Trial Judge: Edward J. Cashman

In the above-entitled cause, the Clerk will enter:

Father appeals an order by the family division of the superior court terminating his parental rights with respect to his daughter, D.L.S. We affirm.

D.L.S. was born on November 16, 2008, several months after her mother and father had ended their on-and-off eighteen-month relationship. The child was placed in the custody of the Department for Children and Families (DCF) three days after her birth because the mother's addiction to opiates greatly impaired her ability to care for the child. D.L.S. has remained with the same foster care family since she was removed from her mother's care.

In February 2009, mother stipulated to a merits finding that D.L.S. was a child in need of care or supervision. Father became involved in the juvenile proceedings in March 2009 after genetic testing confirmed that he was D.L.S.'s father. In April 2009, the court issued a disposition order continuing custody of D.L.S. with DCF. The court approved a case plan that called for reunification with the mother or with father if the mother was unable to assume her parental responsibilities. The court also ordered the mother and father to engage in services recommended by the plan. In October 2009, DCF targeted father for reunification because of the mother's inability to turn her life around. Six months later, DCF filed a petition to terminate both the mother's and father's parental rights. The termination hearing was held over four days in December 2010. On the first day, the mother voluntarily terminated her parental rights conditioned on the termination of father's parental rights. In a February 2011 decision, the court concluded that any progress toward reunification had stagnated and that D.L.S.'s best interests required terminating the mother's and father's parental rights. Only father appeals the termination order.

On appeal, father argues that the termination order should be reversed because (1) several of the court's material findings are clearly erroneous; and (2) the court failed to consider his wife as a person "who may significantly affect the child's best interests." 33 V.S.A. § 5114(a)(1). Regarding the challenged findings, father first argues that the court erroneously found that he denied paternity when the mother informed him of her pregnancy with D.L.S. and accepted it only after it was confirmed by genetic testing. The court's findings on this point are supported by the record. Both the mother and father confirmed that father initially denied paternity when

she informed him that she was pregnant. The court found that after genetic testing confirmed his paternity, "he accepted the legal fact of paternity." This is accurate. He did not take steps to assert his parental rights in the juvenile proceedings until the testing confirmed his paternity in March 2009.

Next, father challenges several court findings suggesting that he has a violent nature that still poses a threat to others. According to father, he has not engaged in violent behavior since a domestic assault incident of smothering the mother in 2002, he has been addressing his past tendency toward violence in therapy, and he no longer has a proclivity towards such behavior. Father first complains about the court's reference to an incident in 2008 when he allegedly slapped the mother, threw her across the room, spilled urine on her purse, and smeared blood on her face. Father contends that the court merely noted what the mother had reported, which he denied doing. While it is generally true that the court's findings regarding the 2008 incident are couched in terms of what mother reported, the court also found that father acknowledged most of the incidents, but explained them as self defense. The court expressly found later in its decision that it did not find father's self-justifying rationalizations credible, and the court's overall findings indicate that, irrespective of the details of incidents of abuse reported by the mother, the court credited the mother's testimony that father continued to engage in domestic abuse up until the end of his relationship with her. See In re A.F., 160 Vt. 175, 178 (1993) (noting that determinations of credibility and weight of evidence lie within sound discretion of trial court).

Father also asserts that the court erroneously suggested that he posed a threat to others in findings describing the mother's reasonable fears that he will return to violent conduct and an October 2010 incident at the Lund Center where he visited his daughter. The Lund Center incident turned out to be father's last visit with D.L.S. at the Center. The record supports the court's findings that father arrived at the Center appearing to be under the influence of alcohol or drugs, became agitated when he learned that D.L.S. would arrive late because of traffic, displayed his anger with karate kicks and loud noises while alone with his wife in a separate room, angrily confronted other Center staff as he left the room, and engaged in incoherent speech patterns during which he explained, among other things, that he could see darkness surrounding people in the form of black dust. Given father's abusive history with the mother, his conduct during the October 2010 Lund Center incident, and the testimony of at least four other service providers that father had engaged in threatening behavior towards them on separate occasions between June 2009 and October 2010, the record supported the court's findings that service workers had good reason to fear father and that the mother reasonably feared that father's violent behavior would resurface. Regarding a related challenge to another finding, father is correct that the court did not require him to engage in a domestic assault education program, but nonetheless, the record supports the court's findings that he refused to engage in the program even though it was recommended by service providers and that he responded in a threatening tone to a social worker who encouraged him to participate in the program.

Next, father argues that the court erroneously found that he denied illegal drug use and rejected substance-abuse counseling. Again, the record supports the court's findings in this area. The court found at one point that father "reported no history of illegal drug use or substance abuse," but this finding was apparently made in the context of describing what occurred at a mental health evaluation in which father participated in the spring of 2009. Indeed, the court later found that father acknowledged his chronic use of marijuana. The record supports the court's view that although father acknowledged his use of drugs and had made sporadic efforts to address his substance-abuse problems, he has consistently downplayed his continuing drug problem and he has resisted serious substance-abuse counseling. There is little doubt that father's drug use could have a negative impact on his ability to parent D.L.S.

2

Father also argues that the evidence does not support the court's findings indicating the absence of a significant bond between him and D.L.S. According to father, the court should have focused on the testimony of the most recent visit supervisor, who stated that he was a loving, caring parent able to read D.L.S.'s cues and that D.L.S. had been feeling a connection to him in the last couple months of his visits. While the most recent supervisor provided some positive feedback regarding interactions between father and D.L.S., the testimony from the Lund Center educators indicated, if anything, a deterioration of that relationship as late as the fall of 2010. The cumulative evidence demonstrated that although father had made some progress with respect to his case plan since the fall of 2009, he had failed to adequately address mental-health and substance-abuse issues that interfered with his ability to assume parental responsibility over a child who had spent the entire two years of her life with the same foster family, with whom she was thriving. Given these circumstances, the court did not err in terminating father's parental rights.

Father's second argument is that the court failed to give adequate consideration to his wife, who played a significant role during visits with D.L.S. and who would continue to play an important co-parenting role if father were to regain custody of the child. According to father, the court failed to explain his wife's relationship with D.L.S. in its conclusions, even though the relevant statute requires the court, in considering a child's best interests, to assess the interaction and interrelationship of the child with "any other person who may significantly affect the child's best interests." See 33 V.S.A. § 5114(a)(1). We find no basis to overturn the court's termination order. The court acknowledged that father had a stable relationship with his wife and that she had played an important role in visits with D.L.S. Nevertheless, the court did not err in focusing primarily on father, who had parental rights with respect to D.L.S and who was the subject of the termination order. Father's continuing unfitness to parent D.L.S., despite the significant passage of time since she had been placed into foster care, cannot be overcome by relying on his spouse's potential ability to care for the child. Cf. In re N.H., 135 Vt. 230, 237 (1977) (basing conclusion that father, with support of his parents, could care for child on "the absence of any convincing proof that [father] is an unfit parent, demonstrably incapable of providing an appropriate home for his child").

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Brian L. Burgess, Associate Justice

3